**BRESWICK & CO. and Randolph Phillips, as common stockholders of Alleghany Corporation, Plaintiffs,**

v.

**UNITED STATES of America, The Interstate Commerce Commission, Alleghany Corporation, The New York Central Railroad Company and Joseph S. Gruss, Charles H. Blatt, Albert B. Cohen, Arthur A. Winner and Alvin J. Delaire, a copartnership doing business under the firm name and style of Gruss & Co. and Samuel A. Mehlman, Defendants.**

United States District Court
S. D. New York.

July 21, 1955.

Injunction Stayed in Part, 75 S.Ct. 912.

Rosston, Hort & Brussel, New York City, for plaintiff Breswick & Co., George Brussel, Jr., and Eugene G. King, New York City, of counsel.

Randolph Phillips, New York City, pro se.

Stanley N. Barnes, Asst. Atty. Gen., J. Edward Lumbard, United States Atty., New York City, Albert Parker, James H. Durkin, Spe. Assts. to the Atty. Gen., for defendant United States.

Samuel R. Howell, Acting Gen. Counsel, Leo H. Pou, Associate Gen. Counsel, Washington, D. C., for defendant Interstate Commerce Commission.

White & Case, New York City, Wheeler & Wheeler, Washington, D. C., for defendant Alleghany Corp., Edward K. Wheeler, Washington, D. C., David Hartfield, Jr., New York City, Robert G. Seaks, Knoxville, Tenn., Andrew O. Miller, Oyster Bay, N. Y., Morton Moskin, Jamaica Estate, N. Y., of counsel.

Harold H. McLean, New York City, Edward K. Wheeler, Washington, D. C., for defendant The New York Central R. R. Co.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants Gruss & Co., Harold H. Levin, New York City, of counsel.

Samuel A. Mehlman, New York City, pro se.

Before HINCKS, Circuit Judge, and DIMOCK and WALSH, District Judges.

DIMOCK, District Judge.

This action was originally brought for an injunction requiring the Interstate Commerce Commission to set aside two of its orders to the extent that they granted the application of Alleghany Corporation to be "considered as a carrier" subject to the provisions of sections 20(1) to (10) inclusive and sections 20a(2) to (11) inclusive of the Interstate Commerce Act, 49 U.S.C. §§ 20(1)–(10) inclusive, 20a(2)–(11) inclusive.

By supplemental complaint and stipulation the scope of the action has since been extended so as to include a prayer for an injunction against the enforcement of two orders of the I.C.C. approving a proposed exchange of preferred stock of Alleghany.

The matter now before this court is an application for an interlocutory injunction vacating the said orders that Alleghany be considered as a carrier and enjoining the enforcement of the two orders dealing with the preferred stock.

On September 17, 1954, Alleghany, The New York Central Railroad Company and two subsidiaries of the New York Central, Louisville & Jeffersonville Bridge & Railroad Co. and The Cleveland, Cincinnati, Chicago and St. Louis Railway Company, known as "the Big Four", filed with the I.C.C. an application pursuant to section 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2). On its face, the principal object of the application was to obtain approval for a merger of the Bridge Company into the Big Four. The substantial effect of the granting of the application, however, would have been, as claimed by Alleghany, to constitute Alleghany, pursuant to the provisions of section 5(3), a non-carrier "considered as a carrier" subject to the above-designated provisions of the Interstate Commerce Act for the purpose of the issuance of securities, etc. It is agreed on all hands that, except for the effect of such an order that Alleghany should be "considered as a carrier", it would be an investment company subject to the provisions of the Investment Company Act, 15 U.S.C. § 80a–1 et seq., for the purposes of the issuance of securities, etc. Thus, according to Alleghany's theory, the granting of the application constitutes a determination that Alleghany in issuing securities is subject to supervision of the I.C.C. rather than the Securities and Exchange Commission. The immediate importance of this is in connection with the issuance of a new class of preferred stock pursuant to a voluntary exchange offer authorized by the Alleghany directors, made public on February 2, 1955 and approved by the I.C.C. in the orders under review but not by the S.E.C.

Alleghany filed with the I.C.C. its application for leave to issue the new class of preferred stock on February 18, 1955.

On March 2, 1955, the I.C.C., through its Division 4, approved the merger application and, on May 24, 1955, the I.C.C. through the whole Commission, affirmed this approval. These two orders of approval are the ones now being reviewed by this court and which were included in the original complaint. Since their effect was the same they will usually be referred to herein in the singular.

On May 26, 1955, two days after the order of the full Commission approving the merger, Division 4 of the I.C.C. approved the issuance of the preferred stock.

On June 6, 1955, the complaint in this action was filed and, on June 15, 1955, plaintiffs made this application seeking a preliminary injunction against enforcement of the jurisdiction assuming orders. Attack on the preferred stock order was postponed prior to the action of the full Commission on the theory that review would be premature.

On June 22, 1955, the entire Commission affirmed the preferred stock order of Division 4. These two preferred stock orders are also now being reviewed by this court but they were added by supplemental complaint. Like the jurisdiction assuming orders they will usually be referred to in the singular.

On June 23, 1955, Alleghany, immediately upon learning of the full Commission's order finally approving the issuance of the preferred stock, began distribution of the new stock pursuant to the exchange offer. That distribution was halted by a temporary restraining order issued by this court but not before more than half of the proposed issue had been exchanged. The effect of that temporary restraining order has been to prevent the transfer of the shares of new preferred stock and consequently to halt trading therein on the New York Stock Exchange. We are advised that, before trading was actually stopped, there had

been sales amounting to 2,400 shares of stock.

Since the institution of the proceeding, The New York Central Railroad, Alleghany and two holders of Alleghany preferred stock, Gruss & Co., a copartnership, and Samuel A. Mehlman, have been granted leave to intervene as defendants.

As above indicated, Alleghany's theory is that, as a result of the determination of the merger application, Alleghany obtained the status of a non-carrier deemed to be a carrier for the purpose of coming under the supervision of the I.C.C. for matters relating to the issuance of securities, as distinguished from the status of an investment company coming under the supervision of the S.E.C. for such matters.

The statutory provisions involved are the following:

Interstate Commerce Act, § 5, 49 U.S.C. § 5.

"(2) *Unifications, mergers, and acquisitions of control.*

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier

through ownership of its stock **or** otherwise; * * *.

*"(3) Non-carrier deemed carrier upon acquiring control.*

"Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2), to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to such of the following provisions as are applicable to any carrier involved in such acquisition of control: Sections 20(1) to (10), 304(a) (1) and (2), 320 and 913 of this title, (which relate to reports, accounts, and so forth, of carriers), and sections 20a(2) to (11), and 314 of this title, (which relate to issues of securities and assumptions of liability of carriers), including in each case the penalties applicable in the case of violations of such provisions."

At the threshold defendants make two objections: first, that the jurisdiction assuming order is not reviewable and second, that, even if it is reviewable, plaintiff has no standing to review it.

### Reviewability of the Orders.

Shannahan v. United States, 303 U.S. 596, 58 S.Ct. 732, 82 L.Ed. 1039, is said to be authority against the reviewability of the jurisdiction assuming order. The determination there held to be unreviewable was a finding that the carrier concerned was not an interurban railroad and was therefore subject to certain provisions as to labor dispute mediation.

The Supreme Court in Rochester Tel. Corp. v. U. S., 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, seemed to disagree with the Shannahan decision on the facts but Justice Frankfurter, 307 U.S. at page 131, 59 S.Ct. at page 757, explained its principle by quoting the statement of Justice Brandeis in United States v. Los Angeles & S. L. R. Co., 273 U.S. 299, 310, 47 S.Ct. 413, 71 L.Ed. 651, to the effect that there can be no review of an order

"which does not change the carrier's existing or future status".

Here the status of Alleghany, absent an order of the I.C.C. under sections 5(2) and 5(3), that it should be considered as **a** carrier subject to the Interstate Commerce Act, was that of an investment company subject to the provisions of the Investment Company Act. The orders sought to be reviewed changed its "existing or future status". Hence the quoted principle of the Shannahan case does not prevent their review.

Justice Frankfurter in the Rochester case, besides quoting from Justice Brandeis, stated the rule for himself as follows, 307 U.S. at page 132, 59 S.Ct. at page 758, "Where a complainant seeks the Commission's authority under the terms of a statute and the Commission's action is followed by legal consequences * * or where the Commission's order denies an exemption from the terms of the statute * * * the road to the courts' jurisdiction seems to be clear."

Here the I.C.C. granted an exemption from the terms of the Investment Company Act. That act, by section 3(c) (9), 15 U.S.C. § 80a–3(c) (9), excepts from the "investment company" class, "[a]ny company subject to regulation under the Interstate Commerce Act". Section 5(3) of the Interstate Commerce Act, under which the I.C.C. acted in making the order here, provides that the non-carrier shall, "to the extent provided by the Commission in such order", be considered as a carrier subject to the enumerated provisions of the Interstate Commerce Act. By making Alleghany subject to the Interstate Commerce Act, the I.C.C. exempted it from the Investment Company Act and thereby brought the order within the test for reviewability laid down in the Rochester case.

There is no room here for any idea that might be generated by the Shannahan case that an attempt to review the jurisdiction assuming orders is premature. The jurisdiction has been exercised by the adoption of the order approving the issue of the preferred stock.

Defendants intimate that the order approving the issue of preferred stock is permissive only and that it is therefore unreviewable citing a statement in Miller v. United States, D.C.S.D.N.Y., 277 F. 95, that an order of the I.C.C. approving the issuance of securities does not direct the issuance but only puts the carrier in a position where, if the securities are issued they will be valid.[1] If this statement were intended to lay down a rule that permissive orders of the I.C.C. may not be reviewed, the law has since been settled to the contrary. In New York Central Securities Corp. v. United States, D.C.S.D.N.Y., 54 F.2d 122, affirmed 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, a stockholder was allowed to review an order of the I.C.C. which authorized, but did not direct, action by the corporation. Accord: Chicago Junction Case, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667.

### Plaintiffs' Standing to Review the Orders and "Irreparable Damage".

The Investment Company Act, Aug. 22, 1940, c. 686, Title I, §§ 1–53, 54 Stat. 789, tit. 15 U.S.C. §§ 80a–1 to 80a–52, begins with legislative findings and a declaration of policy. Section 1(b) declares that the "interest of investors" is "adversely affected * * * when investment companies are * * * operated [or] managed * * * in the interest of directors, officers, investment advisors, depositors, or other affiliated persons thereof". That section ends with a declaration "that the policy and purposes of this subchapter * * * are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."

■ One of the purposes of the Investment Company Act is thus to protect investors in investment companies against the managing of those companies in the interests of persons other than the investors.

The complaint here charges in substance that one Robert R. Young and one Allan P. Kirby are in control of Alleghany and have been conducting Alleghany's affairs primarily in the interest of themselves and a small group of insiders and secondarily in the interest of the other stockholders. It further charges that the application for the orders under review was made at the instance of Young and Kirby for the purpose of escaping the provisions of the Investment Company Act.

■ The stockholders here allege that, by obtaining an erroneous ruling from the I.C.C., persons in control of the corporation have succeeded in escaping the provisions of an act passed for the express purpose of protecting stockholders from persons in control. Since the corporation, by hypothesis, is helpless, plaintiffs say that they have standing to sue to prevent the thwarting of the declared will of Congress. We are convinced that a stockholder, who seeks only that which Congress has provided for him as matter of right, need not show money damage to entitle him to sue. It is enough if he shows that no one else will act on his behalf. Here the corporation, which is controlled by those he is attacking and which has sought the ruling to which he objects, will not help him. While it would perhaps be too much to expect of the S.E.C. to engage in a jurisdictional fight with another great administrative body of coordinate standing, the hard fact is that it has limited its participation to a request to the I.C.C. to surrender part of its jurisdiction as a matter of grace. Moreover no such remedy via the S.E.C. is provided by statute. See Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 154 A.L.R. 1285.

---

1. It is to be noted that the question at issue in that case was whether the section regulating approval of securities had been complied with. Here the question is not merely one of compliance with section 20a but whether any order of the I.C.C., under that section or any other, may stand upon its conclusion that Alleghany is to be deemed a carrier under section 5.

A plenary action by the stockholders against Alleghany to enjoin the issuance of the preferred stock while the orders of the I.C.C. stand in full force and effect would quite properly be met with the defense that they were collaterally attacking an administrative body's determination.[2] The present proceeding, where the I.C.C.'s orders are directly attacked and where as a party it may be heard in their behalf, affords fair play to both sides.

Where the question is that of unlawful usurpation of regulatory control as distinguished from the reasonableness of regulatory action by an agency with conceded jurisdiction, a stockholder has standing to attack an administrative order in which the corporate management has acquiesced even though he cannot show an interest other than a derivative one on behalf of the corporation. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688. There relief was accorded to stockholders against a "breach of duty [which consists] in yielding, without appropriate resistance, to governmental demands which are without warrant of law or are in violation of constitutional restrictions", 297 U.S. at page 319, 56 S.Ct. at page 470, even when the stockholders sued "in the right of", 297 U.S. at page 318, 56 S.Ct. at page 469, the corporation.

Yet, even if we applied the narrower test as to standing to sue applied where a stockholder challenges the reasonableness of the I.C.C.'s regulation rather than its jurisdiction to regulate at all, plaintiffs have sufficient interest apart from the corporation to give them standing to sue. Indeed what they claim here is a right to protection as stockholders against management regardless of the effect of that protection upon the welfare of the corporation. That which they seek is the right of a stockholder not the right of a corporation.

Stockholders were accorded standing to sue under the Urgent Deficiencies Act to review action of the I.C.C. under section 5(2) in New York Central Securities Corp. v. United States, 54 F.2d 122, supra. In that case plaintiff held stock of two kinds: stock of a lessee corporation and stock of lessor corporations. The plan of acquisition involved payment of rent by the lessee corporation to stockholders of the lessor corporations in lieu of dividends. The court held that, as stockholder of a lessee corporation, plaintiff had no standing because "plaintiff cannot have sustained any injury in this respect other than indirectly through the lessee corporation." 54 F.2d 125. "As a minority stockholder of lessor corporations, however, its alleged injury is not merely derivative through its ownership of stock, but is an independent injury to itself as a member of a class created by the leasing agreements between lessors and lessee." 54 F.2d 126.

In Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305, stockholders were permitted to review the I.C.C.'s treatment of their class of stock in a merger plan under section 5 (2).

The principle was expressed by Brandeis, J., in Pittsburgh & W. Va. Ry. Co. v. U. S., 281 U.S. 479, 487, 50 S.Ct. 378, 381, 74 L.Ed. 980, where he said "Finally, the claim that the order threatens the Wheeling's financial stability, and consequently appellant's financial interest as a minority stockholder, is not sufficient to show a threat of the legal injury necessary to entitle it to bring a suit to set aside the order. This financial interest does not differ from that of every investor in Wheeling securities or from an investor's interest in any busi-

---

2. Alleghany did in fact take this position in successfully opposing a preliminary injunction in Breswick & Co. v. Briggs, D.C.S.D.N.Y., 130 F.Supp. 953. It there argued that the I.C.C. determination, if subject to attack by plaintiffs, could only be attacked in a proceeding before a three-judge court to enjoin its enforcement and not collaterally in a stockholders' derivative action against the directors of Alleghany.

ness transaction or lawsuit of his corporation."

The complaint of plaintiffs is that the I.C.C. unlawfully extended the management's power to adjust their relations with other security holders. Except for the allegedly unlawful act of the I.C.C. the preferences and privileges of plaintiffs would have been protected by the Investment Company Act against the manipulation of those in control of the corporation.[3]

The situation is precisely the same as that in the New York Central Securities case, abstracted above, where the stockholder's standing was upheld. The suing stockholder was complaining not because it was to receive rentals but because the corporation was not to receive them. That wrong the stockholder suffered in common with all other stockholders yet the court held that the injury was "not merely derivative * * *, but * * * independent." 54 F.2d 126. In a literal sense nothing could be more derivative than the loss that the stockholder suffered when the I.C.C. permitted the corporation to renounce the right to rent but, in effect, the action of the I.C.C. deprived the stockholders of an independent right to dividends earned by the property of the corporation. So here, it is the whole Alleghany corporation which the I.C.C. has made subject to the Interstate Commerce Act instead of the Investment Company Act but the effect of the action of the I.C.C. is to deprive the stockholders of an independent right not to have their status changed except as permitted by the terms of the Investment Company Act.

Any construction that would identify the interests of these plaintiffs and the corporation would render nugatory the Investment Company Act as an accomplishment of its declared purpose to eliminate the condition that exists when "investment companies" "fail to protect the preferences and privileges of the holders of their outstanding securities". 15 U.S.C. § 80a–1(b) (3).

In none of the cases cited by counsel in support of the argument that plaintiffs have no standing did the plaintiffs have such a direct interest in the question as the suitors here. In Pittsburgh & W. Va. Ry. Co. v. U. S., 281 U.S. 479, 50 S. Ct. 378, supra, the plaintiff minority stockholder sought to attack an order permitting the abandonment of a railroad station. In Alexander Sprunt & Son v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832 and Edward Hines Yellow Pine Trustees v. U. S., 263 U.S. 143, 44 S.Ct. 72, 68 L.Ed. 216, the plaintiffs were shippers who complained that rates, not attacked as unreasonable, worsened their competitive positions. Merchant Truckmen's Bureau v. United States, D.C.S.D.N.Y., 16 F.Supp. 998, was a similar case where the plaintiff did not even have the qualification of being a shipper. In Moffat Tunnel League v. U. S., 289 U.S. 113, 53 S.Ct. 543, 545, 77 L.Ed. 1069, the Supreme Court characterized the plaintiff's interest as "no more than a sentiment". In Miller v. United States, 277 F. 95, supra, the plaintiff alleged that he was a stockholder in a railroad whose properties were in process of foreclosure. He was said to be without standing to review an order of the I.C.C. approving issuance of securities of a new corporation for the properties of the old.

It is said that plaintiffs do not show that "legal injury" which is necessary to give plaintiffs standing. We believe that they show legal injury when they demonstrate that, because of an erroneous ruling by the I.C.C. as to their status, they are subject to possible injury from which they would otherwise be protected. The order under review has exempted the management from the restrictions of the Investment Company Act.

3. The I.C.C. control with respect to the issuance of securities is merely to protect against over-issue, not to hold the balance between management and investor.

See Miller v. United States, D.C.S.D. N.Y., 277 F. 95, supra. Cf. Investment Company Act §§ 1–23, 15 U.S.C. §§ 80a–1 to 23.

The Investment Company Act was adopted for the protection of investors. Congress has declared that an investor in an investment company shall have the protection of the act and the protection of the S.E.C. It is no answer to tell plaintiffs that they may come out better under the liberal Interstate Commerce Act than under the strict Investment Company Act. The law forbids the management to subject the investor to that hazard.

Of course it cannot be gainsaid that plaintiffs cannot demonstrate that over the years they would fare better as stockholders if Alleghany had to operate under the Investment Company Act rather than the Interstate Commerce Act. That is immaterial, however. The stockholder in the New York Central Securities case, 54 F.2d 122, supra, was permitted to raise many points other than its point that the rental was inadequate.

The rule that a plaintiff, to entitle himself to an injunction, must show irreparable damage has no bearing on plaintiffs' right to maintain this action. All that it means is that they cannot have an injunction if they have an adequate remedy at law.[4] If plaintiffs have, as we think, this right to invoke the protection of the Investment Company Act against an unlawful assumption of jurisdiction by the I.C.C., they have no adequate remedy at law to vindicate that right.

Plaintiffs' right to a preliminary injunction is a different matter.

To support a preliminary injunction in an injunction suit the plaintiff must show not only that any other remedy than a final injunction would be inadequate but also that an injunction issued after the time involved in waiting for trial would be inadequate protection. Here, unless the issuance of the proposed preferred stock is enjoined it will be issued and in many cases reach the hands of bona fide purchasers so that an unscrambling, in the event of a determination that the I.C.C. approval was unlawful, would be a practical impossibility. Plaintiffs would then find themselves in the position of common stockholders faced with the possibility of dilution of their interest by conversion of this new preferred stock and yet be remediless in spite of the adjudged illegality of the preferred stock. There can be no doubt that without a preliminary injunction the new preferred stock will be issued since distribution had already begun when halted by the temporary restraining order in this case.

## The Claim that Alleghany Must Be Considered as a Carrier Irrespective of the Order Under Review.

Defendants make the further point that plaintiffs were not harmed by the determination of the I.C.C. because Alleghany already had the status of being "considered as a carrier".

That claim is based on the fact that, by an order dated June 5, 1945, in Finance Docket No. 14692, Alleghany was given that status. Chesapeake & O. Ry. Co. Purchase, 261 I.C.C. 239. That order was made in a proceeding begun by the C. & O. September 2, 1944, under section 5(2) of the act, for the acquisition of the Norfolk Terminal and Transportation Company. On September 5, Alleghany filed a supplemental application, joining the C. & O.'s application and "seeking approval and authorization under § 5(3) of the act of control by it, through the C. & O., of the properties of the Terminal Company", and asked approval of the continuance of Alleghany's relationship with the carriers controlled by it, directly or indirectly, including the C. & O., the Nickel Plate and the Pere Marquette.

4. Kerr on Injunctions, 3rd Ed. Chap. III, § 1, p. 14; Charles C. Wilson & Son v. Harrisburg, 107 Me. 207, 218, 77 A. 787; Smith v. Shiebeck, 180 Md. 412, 24 A.2d 795; Hodge v. Giese, 43 N.J.Eq. 342, 11 A. 484, 487; Columbia College of Music, etc., v. Tunberg, 64 Wash. 19, 116 P. 280, 282; Miles Laboratories v. Seignious, D.C.E.D.S.C., 30 F.Supp. 549.

In making the order of June 5, 1945, the I.C.C. made, among others, the finding, p. 261, that "acquisition by Alleghany Corporation of control, through ownership of stock as above described, of Chesapeake & Ohio, Nickel Plate, Pere Marquette and their subsidiaries and affiliates, is a transaction within the scope of section 5(2) of the Interstate Commerce Act * * *" and provided in the order that "unless and until otherwise ordered by this Commission said Alleghany Corporation shall be considered as a carrier subject to the provisions of Section 20(1) to (10), inclusive, and Section 20a(2) to (11) inclusive, of the Interstate Commerce Act".

On January 19, 1954, Alleghany divested itself of the C. & O. stock that it had theretofore held. The Nickel Plate stock had been earlier sold and the Pere Marquette merged with the C. & O. Upon the suggestion of those facts the I.C.C. requested Alleghany to show cause why the order of June 5, 1945, in Finance Docket No. 14692, should not be vacated and set aside insofar as it applied to and provided that Alleghany should be "considered as a carrier". Alleghany responded that it would be ready at a proper time to accept an order terminating its control of the C. & O. and requested that action regarding its status be withheld until the proceedings resulting in the order below could be begun. The I.C.C. allowed Alleghany a period of sixty days for that purpose and the proceedings under review were begun before its expiration.

In the proceedings under review the application alleged that Alleghany had "recently" relinquished control of the C. & O. By the orders under review, the effective portions of the order of June 5, 1945, were expressly terminated and declared to be of no further force or effect.

■ Whatever might have been the terms of the order of June 5, 1945, they could not have conferred upon Alleghany qualifications to be "considered as a carrier" which it did not possess. From the instant of Alleghany's relinquishment of control of the C. & O. and the Nickel Plate, plaintiffs here were entitled to the special protection which Congress has provided for stockholders in investment companies which do not control railroads. Although failure to apply for vacation of the order might estop Alleghany, it could not shield it from the S.E.C. and it would not be binding upon such third persons as stockholders of Alleghany. As to all except Alleghany, which had accepted the 1945 order as it read, its provision for regulation by the I.C.C. after the factual basis for I.C.C. jurisdiction ceased, was empty fiat.

Even if the order of June 5, 1945, were effective until terminated, the object of the proceedings below was to substitute control of the New York Central for control of the C. & O. and the Nickel Plate as a basis for declaration of status to be "considered as a carrier". Plaintiffs were entitled to be heard on Alleghany's qualification for that status upon the new basis. Carriers are not interchangeable at will.

Failure to Find that Alleghany's Control of the New York Central is "Consistent with the Public Interest."

A fundamental question presented is whether the I.C.C. was empowered by section 5(3) to direct that Alleghany should be "considered as a carrier" even though Alleghany, in applying for consideration as a carrier, did not seek authority to acquire control of a carrier.

■ To us it seems that the I.C.C. had no such power. It will be noted that section 5(2) empowers the I.C.C. to authorize transactions of two classes: First, transactions involving carriers alone and, second, transactions where persons which are not carriers are involved in relations with carriers. "[A] person which is not a carrier" may be authorized "to acquire control of two or more carriers through ownership of their stock or otherwise" and "a person which is not a carrier and which has control of one or more carriers" may be authorized "to acquire control of another [car-

rier] through ownership of its stock or otherwise".

When we come to section 5(3), we find that "a person which is not a carrier" may be "considered as a carrier" only when it is authorized by an order under paragraph (2) "to acquire control of any carrier or of two or more carriers".

The jurisdiction assuming order in this case did not authorize Alleghany to acquire control of any carrier or of two or more carriers. What it did was to permit a merger of two carriers which were already controlled by a parent carrier, the New York Central, which is said to be controlled by a non-carrier, Alleghany. The case certainly does not fall within the language of the statute in the ordinary acceptance of words.

The effect of the Commission's position is that whenever a holding company in the position of Alleghany deems it desirable to bring itself within the class "considered as a carrier" it needs only to join with its subsidiaries in applying to the I.C.C. for approval of some transaction such as the merger of a railroad bridge company into one of the subsidiary railroad companies. Such a transaction, as, indeed, the transaction here, is completely without significance so far as concerns the question whether the issuance of securities of the top corporation is subject to the jurisdiction of the I.C.C. or the S.E.C. The prayer for approval of the merger is treated as if it were an effective but meaningless incantation to propitiate a medicine man.

Alleghany and the Commission contend that by administrative interpretation such an intra-system merger subjects the non-carrier parent to I.C.C. regulation pursuant to section 5(3). They rely on Chesapeake & Ohio Railway Company-Purchase, 261 I.C.C. 239, supra; Nicholas, Fayette & Greenbrier R. Co. Lease, 261 I.C.C. 546; and Warrior & Gulf Nav. Co. Control, 250 I.C.C. 26. These cases in turn refer to two others: United Parcel Service of Portland—Purchase—Wiese, 37 M.C.C. 473, and Atchison, T. & S. F. Ry. Co.—Control—Santa Fe Trail Transp., 15 M.C.C. 469. Although these cases show the need for I. C.C. authorization for consolidation under section 5(2), they do not support the present contention that such consolidation between already acquired subsidiaries constitutes "acquisition of control", or that a non-carrier parent not previously subject to section 5(3) becomes subject to that section by such a consolidation. In Chesapeake & Ohio Railway Company-Purchase, supra, Alleghany, the non-carrier parent, was held subject to section 5(3) but this was not upon the basis of the intra-system consolidation in that case. It was upon the basis of Alleghany's application for retroactive approval of its acquisition of control over the Chesapeake & Ohio, the Nickel Plate and the Pere Marquette. Neither does Warrior & Gulf Nav. Co. Control, supra, constitute such a holding. There the Commission asserted that the acquisition of direct control of a subsidiary in place of indirect control through another subsidiary subjected the non-carrier parent to regulation under section 5(3). It concluded, however, that, because the parent was not primarily in the transportation business, it would not seek to exercise such regulation. Thus, the assertion in that case was but a dictum never put to the test of execution.

By another construction of the statute, also erroneous we think, the I. C.C. has created a situation where a non-carrier may, without approval of the I. C.C. acquire control of a railroad system and then, if and when it suits the non-carrier's convenience to seek refuge with the I.C.C., ask its approval of an intra-system merger and, as a result, obtain a declaration under section 5(3) that the non-carrier must thenceforth be considered as a carrier subject to the security issuance provisions of the Interstate Commerce Act. This second construction which we think erroneous is the one adopted in the opinion of the full Commission where it said "As Central, at the time of [Alleghany's] acquisition of control was recognized as a single established system, we conclude that the

transaction was not within the scope of the above-stated provisions of section 5(2) of the act and that our approval was not necessary."

Under Section 5(2) I.C.C. approval is required for the acquisition of two or more carriers. The statute says "carriers", not "systems", yet the I.C.C. has here held that control of a previously affiliated system may be obtained by a non-carrier corporation without its approval. Under similar circumstances the I.C.C. entertained applications for approval of the acquisition of a carrier holding company in Weinstein-Control-Capital Transit Co. and Montgomery, 56 M.C.C. 127, and Seaboard Air Line Ry. Co. Receivership, 261 I.C.C. 689. We believe that where a non-carrier acquires control of the parent corporation of a railroad system it acquires control of the subsidiaries and consequently of "two or more carriers" so as to require I.C.C. approval. The Commission mentions no authority in support of its position but it does express its distaste for the controversies into which it would be projected if it complied with a literal reading of the statute. We believe its position unsound and that it constitutes a surrender of power which Congress regarded as important to the public interest. The attendant difficulties conjured up by the Commission are greatly exaggerated. Without undue trouble it should be able to distinguish the usual proxy contest from the acquisition of holdings by a single person or corporation of such a block of stock that it has taken control from the other stockholders.

Consideration of the purposes of the statute emphasizes the destructive aspect of the construction put forward by the Commission. Congress was concerned with three problems: the consolidation of carriers into economically sound systems in accordance with a national plan of transportation to be developed by the I.C.C.; the affiliation of carriers through common parents; and the regulatory control of non-carrier parents. Each presented questions of fundamental nationwide importance, and constituted the very heart of the constructive, progressive program for which Congress looked to the Commission, rather than something to be avoided under the pressure of less important though perhaps more immediate tasks. Further, contrary to the views which apparently guided the Commission, Congress did not seek to hide or quiet controversy. It felt that the protection of the public lay in public exposure, as well as the expertness of the Commission. In section 5(2) (b), it set forth not only the mandate that interested parties be heard but also the authorization for public hearing and the requirement of notice to the governors of affected states for both consolidation and acquisition of control.

Here the Commission would escape any responsibility as to the acquisition of the Central by Alleghany and focus public attention only upon the merger of the Louisville and Jeffersonville Bridge & Railroad Company into the Big Four, all the while trying to keep regulatory control of Alleghany and thus preclude any consideration of the matter by the S.E.C. The undesirable consequences of the Commission's double misinterpretation of section 5 thus become all the more pointed. Alleghany's actions with respect to the New York Central and the use of its funds in that connection were transactions of a nature that Congress regarded with particular concern. Its concern was expressed in the Investment Company Act which imposed restrictions upon management of companies similar to Alleghany, and provided for regulation of these companies by the S.E.C. Its concern was also manifested in section 5 which, before the advent of the S.E.C., attempted to enable the I.C.C. to reach companies such as Alleghany. Here, the I.C.C.'s action defeats both plans for regulation.

The S.E.C. had commenced its own proceeding looking to a possible reassertion of its jurisdiction over Alleghany as an investment company. It suspended this proceeding to avoid conflict with

the I.C.C. and submitted to it its plea that the I.C.C., in its discretion, recognize that, regardless of its claim to jurisdiction over Alleghany as a carrier, it was primarily an investment company rather than a transportation company, and that accordingly the I.C.C. not subject it to regulation under section 5(3). This is what the I.C.C. had done in other cases. See Warrior & Gulf Nav. Co. Control, 250 I.C.C. 26, supra. The I.C.C. denied the application of the S.E.C. apparently upon the ground that it had no power to comply with it, saying "We believe that unless Congress amends either or both of the statutes involved herein, the results which S.E.C. desires to achieve are not within our power under the Interstate Commerce Act." Such a conclusion is without foundation. Weinstein-Control, 56 M.C.C. 127, supra; Arkansas & L. M. Ry. Co., 282 I.C.C. 254; Columbia Investment Co.-Control, 55 M. C.C. 375; Warrior & Gulf Nav. Co. Control, 250 I.C.C. 26, supra; Cambria & I. R. Co. Control, 275 I.C.C. 360; Cuyahoga Valley Ry. Co. Control, 252 I.C.C. 683; Saginaw Dock & Term. Co. Contract Carrier Application, 260 I.C.C. 657. It is not necessary now for us to pass upon the question of whether the I.C.C.'s failure to comply with the S.E.C.'s petition is reviewable as an abuse of discretion.

Our conclusion that, where no acquisition of a carrier is involved, the I.C.C. has no jurisdiction under sections 5(2) and 5(3) to provide that a non-carrier shall "be considered as a carrier" subject to the security-issuance provisions of the Interstate Commerce Act does not mean that the proceeding below must be dismissed. Alleghany sought a finding that it controlled New York Central. It was on that theory that it considered itself a necessary party to the application under its interpretation of U. S. v. Marshall Transport Co., 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110. Regardless of whether the merger application involving the Bridge Company and the Big Four could have been presented without Alleghany's participation, the facts remain that Alleghany did participate, that it did ask for a determination of its control of New York Central as a condition to a declaration of its status as a non-carrier "considered as a carrier" and that the I.C.C. did so declare. The mere fact that Alleghany based its plea for consideration "as a carrier" on a request for approval of the merger rather than on a request for approval of acquisition of control of the New York Central is of no consequence where a finding of control of the New York Central was essential to the granting of its plea.

We do not think that the I.C.C. was without jurisdiction in the proceeding below to approve that acquisition. Indeed, if Alleghany was correct in its contention that it had acquired control of New York Central in a proxy fight preceding the stockholders' meeting of May 26, 1954, I.C.C. consideration of the question was long overdue. Under our interpretation of the statute the I.C.C. could not have made a finding of control without approving control, yet it failed to make the prerequisite finding that the control was "consistent with the public interest" required by subdivision (b) of section 5(2). The case must go back for consideration of that question if Alleghany persists in its claim that it has acquired control of New York Central and in its desire for a declaration of its right to be "considered as a carrier".

Adequacy of the Finding of Control.

Even if we were to ignore the absence of a finding of consistency with the public interest, the I.C.C. made no adequate finding of control in the jurisdiction assuming order.

The findings in the determination under review on this subject are very oblique.

The provisions contained in the determination of Division Four are as follows:

"The capital stock of Central is widely held by the public, but control of its functions reposes in Alleghany and its officers as a result of

a proxy contest preceding a stockholders' meeting of May 26, 1954, at which the nominees chosen by Alleghany were elected as Central's board of directors. Alleghany has an undivided half interest in 600,000 shares of Central stock with voting rights to the 600,000 shares under joint venture agreements, and in addition, owns 15,500 shares. The voting rights of Alleghany represent almost 10 percent of the total shares of Central stock outstanding. The chairman of the board of directors of Alleghany, who holds the same position with Central, beneficially owns 100,200 shares of the latter's stock. The president of Alleghany is a director of Central, and beneficially owns 300,100 shares of the latter's stock. A vice-president of Alleghany holds a similar position with Central. (Sheet 3).

"We recognize that the present control of the Central system has passed to Alleghany by regular corporate procedures even though our approval in the premises has not been sought. * * * The important thing is that Alleghany does control one of our largest railroad systems and the regulation thereof in the public interest is our responsibility. * * * (Sheet 16).

"For the reasons stated we think that we are warranted in continuing Alleghany in its present status. Accordingly, we will, pursuant to section 5(3), subject Alleghany to the provisions of section 20(1) to (10), inclusive, and section 20a(2) to (11), inclusive, of the Interstate Commerce Act. In the event that future circumstances warrant any change or modification of this finding, we retain jurisdiction to enter any order we deem necessary to protect the public interest." (Sheet 17).

The full Commission in its opinion said: (Sheet 9).

"The contention that Alleghany does not control the individual directors on Central's board ignores the realities of the situation. Alleghany and its allied interests have succeeded in electing sufficient members of the board to permit them to organize and elect their own officers. Clearly the tenure in office of such directors as permitted this action depends upon their conformance to the views of the stockholders who elected them. In our opinion the power thus reposing in Alleghany constitutes control of Central."

The full Commission also said: (Sheet 11).

"* * * We affirm the findings of Division 4 that these transactions and the continued control by Central and Alleghany are within the scope of section 5(2) of the act, as amended, that the terms and conditions are just and reasonable and that the transactions and continued control will be consistent with the public interest.

"As appears from the foregoing discussion, Alleghany at the time it filed its application was in fact a person not a carrier which controlled an established system, and which was seeking authorization under section 5(2) for modified control of one of the system subsidiaries. * * * It is our opinion that division 4 properly applied the quoted provisions of the act. We affirm that ruling."

It will be observed from the above that Division 4 made an unqualified statement that it recognized that control of the Central had passed to Alleghany. That conclusion can stand, however, only if ultimate facts to support it are expressly found in the order of the Commission. State of Florida v. United States, 282 U.S. 194, 215, 51 S. Ct. 119, 75 L.Ed. 291; City of Yonkers v. United States, 320 U.S. 685, 692, 64 S.Ct. 327, 88 L.Ed. 400. To serve that purpose we have the statement of Division 4 that control of the functions of Central "reposes in Alleghany and its officers as a result of a proxy contest preceding a stockholders' meeting of

May 26, 1954, at which the nominees chosen by Alleghany were elected as Central's board of directors." There is, however, nothing to support the statement that the nominees were actually chosen by Alleghany and some doubt is cast upon that by the fact that the preceding statement is that control reposes "in Alleghany and its officers". That statement in turn is much like the statement of the full Commission to the substantial effect that Alleghany "and its allied interests" control New York Central.

To return to the findings of Division 4, its order discloses the fact that Alleghany's beneficial holdings of the Central stock are less than the combined individual holdings of Kirby, Young, Richardson and the Murchison group.

In a proceeding before Judge Walsh involving the application for approval of the issuance of new preferred stock, Breswick & Co. v. Briggs, 130 F.Supp. 953, supra, he filed an opinion, dated April 6, in which he noted that Alleghany's voting power was increased by a joint venture agreement which gave it the power, at that time to vote 300,000 shares of the Murchison stock. He called attention to the fact that the details of this joint venture agreement as to terminability and other matters did not appear from the opinion of Division 4.

In spite of the fact that consideration of the applications for the orders now under review was undertaken subsequent to the filing with the Commission of Judge Walsh's opinion, no evidence supplementing the evidence outlined in the order of Division 4 in this case on the subject of control of the Central by Alleghany was introduced.

The position taken by the plaintiffs throughout has been that Alleghany was but an instrument employed by the Young-Kirby-Murchison group in the control of the New York Central and was in no sense in control. It is to be observed that the findings of neither Division 4 nor the I.C.C. meet this issue squarely.

We are forced, therefore, to the conclusion that the findings do no more than say that Alleghany, with someone else, controls New York Central. They do not even say whether the someone else, alone, has control. Does that satisfy the statute?

There is internal evidence in the statute itself that a non-carrier to have control within the meaning of that term as used in the statute must be in sole control. Section 5(2) enumerates cases, as we have said, of two kinds: one class dealing with carriers alone and the other class dealing with persons who are not carriers but are in control of one or more carriers. In the first class of cases, the statute enumerates instances where two or more carriers may be in control of another carrier, but when the statute comes to deal with the case of a non-carrier in control of carriers, it enumerates only the instances where "a person which is not a carrier" acquires control. Thus, the statute, by its terms, makes no attempt to cover the case where a carrier or carriers is controlled jointly by non-carriers.

This is not to say that where a group is nominally in control of a carrier no member of the group may be subjected to the obligation of section 5. The supervisory jurisdiction over such combinations will turn on the facts of the case, but those facts must at least be made explicit in the findings of the Commission. The purpose of a finding is to explain the basis of action, not to mask it.

We thus conclude that, if the Commission's opinions contain a conclusion that Alleghany is in control of New York Central, those opinions lack sufficient findings to support that conclusion.

### The Failure to Grant Plaintiffs a Hearing.

Section 5(2)(b) provides that, in such a proceeding as the jurisdiction assuming proceedings below, the Commission "shall afford reasonable opportunity for

interested parties to be heard". Plaintiffs made repeated applications for leave to be heard in the jurisdiction assuming proceedings. It was only after Judge Walsh's opinion in the case involving the preferred stock, Breswick & Co. v. Briggs, 130 F.Supp. 953, supra, was filed with the I.C.C. that plaintiffs' application for intervention was granted, and then it was granted only in the very order which approved the merger, foreclosed the issue and constituted Alleghany a person "considered as a carrier". All of that appeared in the order of May 24, 1955 of the full Commission. Division 4 had theretofore consistently denied intervention by the plaintiffs.

The action of the Commission in permitting intervention "as of the date" of the order of May 24, 1955 was completely insufficient, except perhaps to strengthen plaintiffs' standing as one entitled to review the order.

Plaintiffs' papers on this application are full of allegations of fact bearing on the question of control which should have been before the Commission and to which the Commission made no reference in its orders.

■■■■ If plaintiffs were "interested parties" and thus entitled to be heard under the statute, there can be no doubt that the loss of their opportunity to present their evidence requires the setting aside of the determination. The Administrative Procedure Act, section 2(b), 5 U.S.C. § 1001(b), defines "party" as follows:

"'Party' includes any person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any agency proceeding".

It will be recalled that plaintiffs were finally permitted to intervene in the jurisdiction assuming proceeding. Under the Administrative Procedure Act there is no such thing as permission to intervene without permission to be heard and present evidence. Administrative Procedure Act, section 5(b), 5 U.S.C. § 1004(b), reads as follows:

"§ *1004. Adjudications*

"In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing,—* * *.

"*(b) Procedure*

"The agency shall afford all interested parties opportunity for (1) the submission and consideration of, facts, arguments, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit, and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing, and decision upon notice and in conformity with sections 1006 and 1007 of this title."

Section 7(c), 5 U.S.C. § 1006(c) provides:

"Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

Even before the passage of the Administrative Procedure Act the necessity of granting a hearing to interested parties before the I.C.C. seems to have been settled. See U. S. v. Abilene & So. Ry. Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016; *Chicago Junction Case*, 264 U.S. 258, 44 S.Ct. 317, supra; Interstate Commerce Comm. v. Louisville & Nashville R. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431.

Defendants in opposition to this urge only that the matter of granting a hearing has been placed in the absolute discretion of the I.C.C. by section 5(2) (b) where it says:

"If the Commission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing; and a public hearing shall be held in all cases where carriers by railroad are involved unless the

Commission determines that a public hearing is not necessary in the public interest."

The above-quoted language is in addition to and follows immediately after the mandatory direction "and shall afford reasonable opportunity for interested parties to be heard". It is thus clear that the public hearing referred to is something quite different from merely hearing the interested parties.

### The Effect of the Views Above Expressed.

To paraphrase slightly the language of the Supreme Court in Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 60 S.Ct. 517, 84 L.Ed. 774, three-judge courts are admonished that, upon applications to them for preliminary injunctions, the question before them is whether the showing made raises serious questions and discloses that enforcement of the act complained of, pending final hearing, would inflict irreparable damage on the plaintiffs.

 We cannot believe that the Supreme Court intends that in a case such as this which presents only questions of law that have been fully argued and briefed by the parties we should limit our consideration to the degree of their seriousness. Our conviction that, more than being serious, they must be answered in favor of plaintiffs is a factor in our determination that an injunction should issue. If, however, a conclusion that the questions are serious is required, it is included in our conclusion that they must be answered in favor of the plaintiffs.

What we have said as to the damage which threatens plaintiffs supports the finding hereby made that unless the enforcement of the orders complained of is enjoined pending final hearing plaintiffs will suffer irreparable damage.

We are authorized to say for the full court that it is prepared to do all in its power to expedite a final disposition of the cause.

An injunction will issue restraining, pending final judgment in this cause, the defendants Interstate Commerce Commission and Alleghany Corporation from enforcing or taking any action pursuant to (a) the orders of the I.C.C. made March 2, 1955 and May 24, 1955, in Finance Dockets 14629 and 18656, insofar as they determine that Alleghany Corporation is in control of The New York Central Railroad, and insofar as they determine that Alleghany Corporation shall be considered as a carrier subject to the provisions of section 20(1) to (10) inclusive and section 20a(2) to (11) inclusive of the Interstate Commerce Act, or (b.) the order of the I.C.C. made May 26, 1955, and June 22, 1955, in Finance Docket 18866 authorizing issuance of 6% convertible preferred stock. The temporary restraining order against exchange of Alleghany Corporation's 6% Convertible Preferred Stock for its Cumulative 5½% Preferred Stock Series A, issued herein on June 23, 1955, is hereby continued pending final judgment.

Settle order on notice.

Walsh, District Judge, concurring.

HINCKS, Circuit Judge, dissenting.

We have immediately before us only the plaintiffs' application for a preliminary injunction (1) to vacate the orders of the I.C.C. in Finance Docket Nos. 14692 and 18656 in so far as it was ordered therein "that unless and until otherwise ordered by this Commission, said Alleghany Corporation shall be considered as a carrier subject to the provisions of Section 20(1) to (10), inclusive, and Section 20a(2) to (11), inclusive, of the Interstate Commerce Act, as amended, 49 U.S.C.A. §§ 20(1–10), 20a(2–11), to the same extent that these provisions are applicable to the New York Central Railroad Company and its carrier subsidiaries and affiliates"; and (2) restraining the enforcement of the orders of said Commission in Finance Docket No. 18866 of May 26, 1955 (by Division 4 of the Commission) and of June 22, 1955 (by the Commission). The orders in said No. 18866 approved the substance and

terms of an offer by the Alleghany Corporation whereby holders of its 5½%, Series A, preferred stock may, at their option, exchange their stock for stock in a new issue of convertible 6% preferred stock.

28 U.S.C.A. § 2284(3) provides power to grant "a temporary restraining order *to prevent irreparable damage*" which "shall contain a specific finding, based on evidence * * * and identified by reference thereto, that specified *irreparable damage* will result if the order is not granted." (Emphasis supplied.) In context, the implication is plain that under the Urgent Deficiencies Act an order of preliminary injunction also must comply with this requirement. If there be any doubt as to the validity of that implication it is set at rest by Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 60 S.Ct. 517, 520, 84 L.Ed. 774. That was a case in which, as here, a three-judge court had before it an application for a preliminary injunction. The Supreme Court held that the granting of the injunction depended on "whether the showing made raised serious questions" of law "and disclosed that the enforcement of the Act, pending final hearing, would inflict irreparable damages upon the complainants." For present purposes I will assume that the showing before us raises serious questions of law and in this dissenting opinion will discuss only the showing made for its disclosure of the companion requirement of irreparable damage.

The application was submitted at a hearing, duly noticed, held on June 28, 1955 on a record of fact which includes only such facts as were admitted in the pleadings and affidavits in support and in opposition, no oral testimony having been offered. There was no stipulation that the submission made on the application should be deemed also to be a final submission on the merits.

The plaintiffs, who hold a comparatively small amount of Alleghany common stock[1] contend, inter alia, that the orders of the Commission, in so far as brought under review in this case, are void for lack of jurisdiction in that on the applicable facts and under the applicable law (particularly 49 U.S.C.A. § 5(3) Alleghany was not a person which could lawfully "be considered as a carrier subject to" regulation under the Interstate Commerce Act. The status thus challenged is one depending upon a mixed question of fact and of law. Certainly *it is so*, and I think not disputed, that the Commission had at least jurisdiction to make a determination of Alleghany's status and, on finding a carrier status to exist, to exercise the jurisdiction thus resulting. Thus, the situation is not one in which the challenged orders are void on their face. At most, the orders are voidable for error in connection with the finding of complex but essential jurisdictional fact.

For purposes of the application now before us, I make the following assumptions: (1) that when the plaintiffs' complaint comes on for hearing on the merits, this court will set aside the orders under review for error in the finding of Alleghany's carrier status and will remand the case to the I.C.C. for further consideration; (2) that eventually a valid order will be entered by that Commission and also by the S.E.C. to the effect that Alleghany is not subject to the Interstate Commerce Act and hence is not excepted by the Investment Company Act of 1940, 15 U.S.C.A. 80a–3(c)(9), from those investment companies which are subject to that Act; and (3) that these plaintiffs have standing to bring this action.[2] Even so, in my view, for lack of

[1]. An intervenor has computed the plaintiffs' interest as comprising only .002% of the outstanding common stock.

[2] If plaintiffs' standing to sue is predicated upon a threatened loss of the protection afforded by the Investment Company Act, 15 U.S.C.A. § 80a–1 et seq., it is difficult for me to reconcile my brothers' holding on this point with Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 487, 50 S.Ct. 378, 74 L.Ed. 980. For I find nothing in that Act which suggests that it was intended, or is effective, as a protection *peculiar to common stockholders*. Nor have plaintiffs

sufficient showing of irreparable damage the plaintiffs are not entitled to the preliminary injunction sought.

The only facts upon which the plaintiffs appear to rely for the preliminary injunction are as follows. Alleghany proposes immediately to complete the distribution of an issue of convertible 6% preferred stock for distribution to holders of an outstanding 5½%, Series A, preferred stock in exchange, at the latters' option, for the Series A stock held by them. The distribution of the new stock, immediately upon entry of the I.C.C. order approving the issue, was partially accomplished before halted by the temporary stay order of this court (which was continued in force pending decision on the application now before us) and will be shortly completed (in so far as holders of the outstanding preferred stock elect to make the exchange) unless the injunction sought is granted. In the record as submitted, I find no other facts pertinent to the issue of irreparable damage. All else is by way of assertion and argument as to the impact on the plaintiffs' rights, as common stockholders, of a distribution of the new stock if the distribution is completed before approval, or disapproval, by S.E.C.

The plaintiffs' assertion of irreparable damage, if of any substance whatever, depends on the validity of their contention that the terms of the issue are such that it will necessarily or probably be disapproved by S.E.C. if and when, by hypothesis, it shall be submitted to S.E.C. That S.E.C. under the Investment Company Act might not approve the issue is, I concede a possibility. But the possibility is too remote for present relevance unless under the facts presently before us and under the provisions of the Investment Company Act ft is reasonably certain that the issue would be disapproved by S.E.C. For this result, the plaintiffs in all their oral argument, and in their voluminous briefs cite neither chapter nor verse. I find nothing in the Investment Company Act which would preclude an approval of the issue by S.E.C. For aught that appears even if the injunction is granted and eventually the proposed stock issue is submitted to the S.E.C., that tribunal after full exercise of its investigative and regulative powers may approve the issue. If this shall prove to be the end result, the plaintiffs will have gained only such satisfaction as they may take from the fact that action which they dislike has the sanction of two tribunals instead of one. Deprivation of such emotional satisfaction is no more irreparable damage than the "sentimental" loss which was held to be insufficient basis for an injunction in Moffat Tunnel League v. United States, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed 1069.

In this connection, I do not overlook the conclusory assertion in the complaint, wholly unsupported by proof, that officers of Alleghany stand to gain, directly or indirectly, from the proposed issue of preferred stock. The possibility of gain has no connotations necessarily sinister. The issue has been approved by large majorities both of the preferred stock and the common stock. Presumably all who voted to approve expected gain. The achievement of that objective by others does not import damage to the plaintiffs.

---

shown that *as common stockholders* they have peculiar need of protection under that Act not available to all classes of Alleghany security holders under that Act. The *Pittsburgh* plaintiffs were held to be without standing because their "financial interest does not differ from that of every investor" in the Company. Even if it were so that the interest of these plaintiffs to protection under the Investment Company Act is as efficacious for purposes of standing to sue as a "financial interest," nevertheless it would seem to me to be an interest which "does not differ from that of every investor" in Alleghany securities. In New York Central Securities Corp. v. United States, D. C., 54 F.2d 122, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, the plaintiff's standing was not based on a claim of right to protection under the Investment Company Act. Reorganization cases and cases under 49 U.S.C.A. § 20b involving the involuntary modification of rights of security holders are not pertinent to the standing of these plaintiffs.

If, however, the assertion was meant to insinuate conduct by directors violative of fiduciary responsibility, it suggests that this litigation may be motivated by a decision to embarrass management by fomenting investigations by S.E.C., or that its true objective is by S.E.C. investigations to obtain ammunition for a stockholders suit. Certainly loss of opportunity to give vent to malice is not the equivalent of irreparable damage. And it seems equally clear that plaintiffs are not entitled to an injunction merely because they would like to supplement the discovery provisions of the Federal Rules of Civil Procedure by S.E.C. investigations. The mere frustration of such a hope is not of itself "irreparable damage." In this connection, it may be noted that by its report in Finance Docket No. 18866, the I.C.C. showed that it was fully apprised of the directors' stock interests in Alleghany.

My brothers point to the declared policy of the Investment Company Act to "mitigate and * * * to eliminate the conditions" which adversely affect "the interest of investors" * * * "when investment companies are organized, operated [or] managed * * * in the interest of directors, officers, * * *." They seem to hold that, even absent any showing of harm to these plaintiffs flowing from the assumption of jurisdiction by I.C.C. and absent any showing that the assumption of jurisdiction by S.E.C. will result in action more advantageous to their interest, they are entitled to the beneficent protection which the Investment Company Act provides against the improvidence or skulduggery of their own management. The possibility of deprivation of that protection, my brothers seem to feel, is proof enough without more to warrant the injunction.

I cannot agree. It is true that in their complaint plaintiffs allege that Alleghany's affairs have been conducted primarily in the interest of those in control. But for this we have only the plaintiffs' bare assertion: no evidence whatever has ever been offered to support that allegation. My brothers make no finding on the point. Thus, for aught that appears this case does not even come within the policy declaration of the Investment Company Act which my brothers are assuming indirectly to enforce.

But that aside, I find nothing in that Act which gives investors in investment companies a right to enforce its policies. Section 42 of the Act, 15 U.S.C.A. § 80a-41(a), specifies that "The Commission shall permit any person to file with it a statement in writing" as to the subject matter of possible investigations but leaves it to the Commission in its discretion to "make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provisions" of the Act. And by Section 80a-41(e) S.E.C. is given power "in its discretion" to bring actions to enjoin violations in a district court. In the light of these carefully limited provisions I think it wholly inadmissible to interpret the Act as according to any private party, whether an investor or a potential investor, a right to enforce the policy of the Act as he conceives it to be. Nor do I think that this court, in the exercise of jurisdiction under the Urgent Deficiencies Act, has carte blanche to enforce its conception of the policy of the Investment Company Act. I conclude that at most these plaintiffs may derive an incidental benefit under the Investment Company Act; that the deprivation of such a benefit, which the plaintiffs concede has no measurable pecuniary value, is not "irreparable damage."

Further, my brothers seem to feel that the plaintiffs are entitled to the injunction sought because without it the proposed issue will be accomplished and, at least as a practical matter, the immediate cause of controversy will become moot. Granted that they are right as to the postulated result, I submit that the conclusion based thereon is faulty. The extraordinary and drastic remedy of injunction is not the product of a slot machine into which any disgruntled stockholder can insert a nickel. It does not issue in every case as of right merely to preserve the *status quo* pending final de-

termination of the merits. Nor is its function merely to support hopes or malice. It issues only at the discretion of the chancellor on a showing of irreparable injury. And that injury must be more than a vague statement of a remote and contingently potential harm. This principle was recognized—although, to be sure, in quite a different setting—in State of New Jersey v. Sargent, 269 U.S. 328, 46 S.Ct. 122, 70 L.Ed. 289; State of Arizona v. State of California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; Commonwealth of Massachusetts v. Melon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; and Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730. I am not so much concerned by the *possibility* that the proposed stock issue may in the long-range future turn out to be disadvantageous to the common stock. After all that is essentially a question of business judgment primarily for management which in the normal course minority stockholders must accept. Here management has made its decision and the decision has been affirmed by a large majority of the voting stocks and approved by the I.C.C. To be sure, Alleghany may eventually be found to be subject to the Investment Company Act, with a result which may, or may not, be more advantageous to common stockholders. The loss of this remote and contingent advantage the law does not, I think, classify as irreparable damage.

Consequently, in the situation here, I am more concerned with the hardship that the injunction will impose on others. From the affidavit of Alleghany's secretary-treasurer received in opposition to the injunction sought, I find that the effect of the injunction will be seriously to embarrass Alleghany (a) in obtaining the renewal of various bank loans aggregating $8,200,000 which will mature on or about September 15, 1955 and (b) in its negotiations for refunding these loans on a more favorable basis. As a result it may become necessary to pay off the loans and for that purpose to liquidate part of its portfolio. (In this connection,

I think it may be inferred that the most favorable terms cannot be obtained by forced liquidation to meet a fixed deadline and that such a liquidation, whatever the terms, is likely to interfere with investment policies). I find further that it will be necessary, if Alleghany is to maintain its policy of parity of representation between outstanding preferred stock issues and the common stock on its Board of Directors, for it either to pay in full the large arrearages of dividends on the 4700 shares of Series A preferred stock which declined to accept the offer of exchange for the new 6% issue, thereby stripping that small block of the right to elect two directors, or to redeem that block of stock. Notice to redeem the stock cannot be given as long as an injunction precludes the distribution of the 400,000 shares of the new preferred still awaiting exchange, and even then under the Alleghany charter redemption can be accomplished only on a stated quarterly dividend date. If this course is precluded by an injunction, to maintain its policy of class representation Alleghany will be required to pay off the arrearages in dividends on this block of stock,—a course which is far more burdensome, tax-wise, to the stockholders involved than redemption which would classify as a capital transaction.

Further, I find from the affidavit of the intervenor Blatt, that at least 100,000 shares of the new preferred stock were traded on a "when issued" basis between May 26, 1955 and June 22, first in the over the counter market and commencing on June 8, 1955 on the New York Stock Exchange; and that trading therein proceeded in a substantial volume on an actual basis on June 24 when further trading on the New York Stock Exchange was suspended because of the stay order herein. From this it is fairly inferable that trading in the stock will not be resumed on the Stock Exchange if the stay order ripens into a preliminary injunction. The further inference is required that during the pendency of an injunction the marketability of the new stock which was issued, and consequently its

value, will be substantially impaired and its acceptability as collateral will be largely destroyed. It is further inferable that an injunction which precludes stockholders who deposited their Series A stock for exchange from receiving the new stock will intensify the confusion and the hardship caused them by the stay order. Their rights, during the pendency of an injunction, to a return of the deposited stock and the obligation to return it involve complicated legal questions which may well require protracted litigation for resolution.

These findings I have tested against the affidavits of Mr. Phillips, one of the plaintiffs who has appeared throughout, *pro se*. His main affidavit shows that he is indeed a man of experience in the field of finance: that for a time prior to November 1941 he was "Executive Assistant" to the Chairman of Alleghany's Board. He states that "In July 1953 I became Financial Consultant to Alleghany Corporation and the C. & O. I was the first expert to be consulted by Mr. Young and Alleghany Corporation in connection with the contest for control of New York Central by the Alleghany-Young-Kirby nominees. Thereafter I was a member of the strategy board that successfully developed and executed the subsequent proxy campaign." But notwithstanding this background, neither by his main affidavit nor his reply affidavit does he show facts—as distinguished from self-serving conclusions—which controvert my findings as above stated. As to the damage to Alleghany which would result from an injunction, he bases his conclusion vaguely on his alleged knowledge of Alleghany's affairs as an insider. But he does not directly assert status as an insider subsequent to July 1953. He also professes to have "general knowledge of I.C.C., S.E.C., and banking practice." On this basis he offers as proof only his assertion of the very proposition which it was for him to prove, viz.; "there is no substantial difficulty which will face Alleghany in the renewal of its $8,200,000 loan, due on Sept. 15, 1955." He says that Alleghany's annual report for 1954 showed "marketable securities on hand with an indicated market quotation of $67,944,633. He did not explain how these securities can be liquidated without loss or interference with investment policies before a deadline two months distant. And as to the impact of an injunction on Alleghany's negotiations to refund its bank loans, he says nothing. As to the impact of an injunction on the composition of Alleghany's Board he seems to think that there is no limit to the extent to which this court can officiate as Alleghany's Board, saying: "it is obvious that this Court of Equity has full power to deal with the situation and to indicate that all holders of the Series A and the 6% Preferred Stock, together, should be entitled to elect two directors." As to this, he assumes more knowledge of the powers of a chancellor than I, at least, possess.

As to the injurious effect of an injunction on Series A stockholders, Mr. Phillips says only that some at least may have deposited their stock as early as February 10, 1955 and thereby voluntarily consented that it should be "frozen" until the closing date of the exchange offer. He does not exclude the possibility that such stockholders might normally be expected to withhold deposit until the closing date was near at hand and deposit then in reliance on the terms of the exchange offer whereby they would receive marketable stock on a fixed date in the near future. He argues that because for a limited period accepting stockholders voluntarily assented to a freeze until a fixed date, it must follow that they will not be injured by an involuntary freeze continued into the indefinite future while this litigation winds its weary way through the courts and the two Commissions. I think the argument specious: without relying on the cries of anguish from frozen stockholders which were expressed informally at the hearing on this application, I think my findings of injury to them as above stated are clearly required as the only sensible inferences from proved facts.

The proved hardship to Alleghany and preferred stockholders is perhaps irrelevant if, as I think, plaintiffs have made no showing at all of irreparable damage. If, however, an appraisal of the record affords some support for a possible finding of such damage to them, I think the impact of injunction on Alleghany and the intervenors is a solid factor which should be given appropriate weight in the formulation of our discretion.

Lastly, I think it not permissible on the submission of a preliminary application which raises the issue of irreparable damage, to proceed, at least in the setting of this case, to a determination of the underlying merits. I freely concede that for its impact on the validity of the orders under review the exegesis of my brothers demonstrates that the showing made is enough to satisfy the first requirement of the quotation in an early page in this opinion from the Mayo opinion, viz., the existence of "serious questions" of law. But their exegesis, even if sound, goes no further than to demonstrate that the plaintiffs have solid ground for attacking the underlying jurisdiction: it does not reach the issue of irreparable damage. Before it can be reflected in a final decree, the defendants and intervenors are entitled as of right to a trial on the merits. At the trial the claim of irreparable damage will be in issue and may be expected to provoke a record of fact not now before us, on the basis of which the right to a permanent injunction must be determined. Even if, after trial, the court feels constrained to annul the orders under review for error in the proceedings before the Commission or in the Commission's jurisdictional findings, it may nevertheless decide that on the record as then made for lack of irreparable damage to the plaintiffs no injunction should issue to restrain Alleghany from completing the stock distribution. Such a disposition would leave Alleghany free to proceed at its own risk in confidence, if so advised, that on appeal the orders annulled would be reinstated. Surely the preliminary injunction now sought should not be granted merely because it is presently thought that at a later stage this court will annul the orders under review.

My conclusion is based not at all upon Alleghany's offer made in open court at the hearing to post a bond in a principal sum exceeding many times the value of the plaintiffs' stock to indemnify them from any loss resulting from the accomplishment of the proposed stock distribution. Nor am I affected by the plaintiffs' indifference to that offer. Since we are not now concerned with an application for a supersedeas bond, I view the offer as irrelevant.

I would terminate the stay order forthwith and deny the application for a preliminary injunction.