In Equity.

CHARLES C. WILSON & SON et al.

*vs.*

HARRY HARRISBURG AND NATHAN GOLDBERG.

Androscoggin.    Opinion October 11, 1910.

*Navigable Waters.    Waters and Watercourses.    Navigable Stream.    Floatable Stream.    Riparian Owners.    Conveyances.    Boundaries.    Ice Ownership. Cutting Ice.    Equity.    Jurisdiction.    Injunction.    Nuisances.    Damages.*

The part of a river above falls and above the ebb and flow of the tide is not a " navigable river" at common law.

A river which in its natural condition, unaided by artificial means, is susceptible to public use to float vessels, rafts, or logs, is a navigable or floatable stream according to the law of Maine, though not a navigable river in the technical sense of the common law.

As to floatable and nontidal streams, a riparian owner owns the bed to the middle, and all but the public right of passage.

A grantor of riparian lands can exclude the bed of the stream and all of the bank beyond a definite line on the top of it by employing apt words.

A deed which describes a line along a nontidal river as running "with," "along," "by," "on," "up" or "down" the stream carries the title to the center thereof, unless the contrary appears.

The bank of a river extends to the margin of the stream, or to that point where the bank comes in contact with the stream, and it is a monument which may be a boundary of a grant.

A deed bounding the land as extending to the outermost line or margin of the bank or shore of a river, and granting water rights in front of the land, did not extend the grant beyond the water's edge, even if it conveyed beyond the brow of the river bank.

The test of a title to ice on a stream is the ownership of the soil over which it forms.

Owners whose lands do not extend beyond the edge of a stream are not riparian proprietors in the full sense of the term.

The basis of equity jurisdiction in cases such as one to enjoin cutting ice from a stream over lands owned by plaintiff is the inadequacy of the common-law remedy manifested chiefly in irreparable injury and continuing or repeated trespasses and nuisances involving a multiplicity of actions at law.

Irreparable injury such as gives equity jurisdiction does not mean that the injury complained of is incapable of being measured by a pecuniary standard.

An appropriation of another's land constituting a permanent injury to and depreciation of the property is an irreparable injury, owing to the uncertainty of the measure of damages.

Where the extent of a prospective injury is uncertain or doubtful, so that it is impossible to ascertain the measure of just reparation, the injury is irreparable in a legal sense, so that an injunction will lie to prevent it.

A continuing nuisance which prevents the comfortable use of one's property and the enjoyment of his property rights creates an irreparable injury, as does one also which may break up a business, destroy its good will, and inflict damages which are incapable of measurement because the elements of reasonable certainty for their computation are wanting.

Where the taking from a river of an ice company's ice and the construction of an ice slip as threatened by defendants would have involved a continuing trespass during that and each succeeding season and an interference with the company's established method of business, it was a threatened nuisance, depriving them of the enjoyment of their property rights, which is subject to injunction.

In equity.   On report.   Bill sustained.

Bill in equity asking that the defendants be enjoined by both temporary and permanent injunctions from cutting and removing ice from the Androscoggin River opposite the shore of their property situated on the east side of the river above the Maine Central Railroad bridge in Lewiston.   A writ of temporary injunction was issued as prayed for.   The defendants filed a joint and several

answer, and the plaintiffs filed the usual replication. The cause
was then heard before the Justice of the first instance and at the
conclusion of the evidence the case was reported to the Law Court
for determination.

The case is stated in the opinion.

*White & Carter, and Newell & Skelton,* for plaintiffs.

*Ralph W. Crockett, and Foster & Foster,* for defendants.

SITTING :    EMERY, C. J., WHITEHOUSE, PEABODY, CORNISH,
KING, JJ.

WHITEHOUSE, J.    This is a bill in equity asking that the defend-
ants be enjoined by both temporary and permanent injunctions from
cutting and removing ice from the Androscoggin River opposite the
shore of their property situated on the east side of the river above
the Maine Central Railroad bridge in Lewiston.    A temporary
injunction was issued as prayed for, and the case comes to the Law
Court on report for final determination.

December 24, 1867, the Franklin Company, a corporation organ-
ized under the laws of Maine and located at Lewiston, was the
owner of land on both sides of the Androscoggin River in Lewiston
and Auburn, including the land in question in this case owned by
the defendants, and land on the opposite side of the river in Auburn.
The plaintiffs claim title to the annual ice crop opposite the defend-
ants' land by virtue of a lease from the Franklin Company for the
term of twelve years from January 1, 1906.

The contention of the plaintiffs is that the Androscoggin River at
the point in question is a floatable stream ; that in 1867, the
Franklin Company, from whom the defendants' predecessors derived
their title by deed of December 24, 1867, was a riparian proprietor
on both sides of the river at the point in question, and as such was
the owner of the entire bed of the river between the two banks, and
of all rights growing out of such ownership, including title to the
ice forming over the bed of the stream.

It appears from the Franklin Company's deed to Bearce and Coe,
the defendants' predecessors in title, that the land thereby conveyed,

is bounded from the point of beginning according to the following call in the deed : "Thence westerly by the Northerly line of Avon street extended about 491 feet to the outmost line or margin of the bank or shore of the Androscoggin river ; thence up river by said line or margin to a point from which a line drawn parallel with the side line of High street extended would strike the point begun at." It is claimed that by this deed the Franklin Company obviously conveyed only to the top of the bank and retained in itself title to the bank of the river and the bed of the stream ; and it is not contended that the defendants have any greater rights than their predecessors acquired by the above named deed.

On the other hand it is argued in behalf of the defendant that the Androscoggin River at the point in question is "navigable" in fact and should be held to be "navigable" and a public river in the technical sense as at common law, though above the ebb and flow of the tide ; that the title to the ice forming on it is in the public and that whatever title the plaintiffs or the Franklin Company may have to the bank or the bed of the river, they have no greater right to the ice crop than the defendants or any other citizen of the State. But it is further argued that by the terms of this deed from the Franklin Company, the defendants' ownership includes not only the bank but the bed of the river and extends to the thread of the stream, and that even if their title does not go to the center of the stream, it is contended that in any event the defendants own the bank of the river and are riparian proprietors and as such they and not the plaintiffs have the exclusive right to the ice crop opposite their land.    Finally it is contended in behalf of the defendants that even if the plaintiffs have a superior title to the ice forming opposite the defendants' premises, the anticipated injury would not be irreparable, and that an adequate remedy for the trespass when committed would be first an action at law for damages, and not a bill in equity for an injunction.

1.    The defendants' premises were situated above the Lewiston Falls, and the Androscoggin River at that point being above the ebb and flow of the tide, was not a navigable river in the technical sense of the common law, but upon the undisputed evidence in this

case, it does appear to be navigable in a popular sense, or a float-able stream, according to the common law of this State. In its natural condition unaided by artificial means, it is susceptible of public use above the Falls for the purposes of commerce, for the floating of vessels, boats, rafts or logs. *Brown* v. *Chadbourne*, 31 Maine, 9; *Pearson* v. *Rolfe*, 76 Maine, 380, and cases cited. In Farnham on Waters, Vol. 1, page 117, (23 f) the author says: "The difficulty with respect to the question as to what streams are naviga-ble arises from failure to distinguish between streams which are navigable and those in which the title is in the public. The mere fact that the title to the bed is in a private owner does not prevent the use of the stream for the purpose of navigation by the public. The King's title to the land under the water was limited by the flow of the tide. But as far as the tide flowed he had the title in the soil, and the use of the water was public because he held the entire title in trust for his subjects. The only purpose for which it becomes a matter of importance to determine whether or not the tide flows is in ascertaining who owns the soil. The distinction does not affect the public easement in the water."

In *Gerrish* v. *Brown*, 51 Maine, 256, it was held that the Androscoggin river at Bethel and Berlin Falls, the points there under consideration, and between them, "though not technically a navigable stream, is of sufficient capacity to float logs and rafts, or in other words is a floatable stream, and as such, by the laws of this State, is deemed a public highway." Such rivers above the influence of the tide are regarded as public, not with reference to the property in the soil, but only with reference to the public use of the streams as highways.

2. With respect to the rights of the riparian proprietor in floatable and non-tidal streams, it is the settled law of this State that he owns the bed of the river to the middle of the stream and all but the public right of passage. *Pearson* v. *Rolfe*, 76 Maine, 385, and cases cited. This is in accordance with the doctrine laid down by Lord Hale in De Jure Maris, ch. 1, in a statement quoted in Farnham on Waters, page 239, viz, "Fresh waters of what kind soever do of common right belong to the owners of the soil adjacent;

so that the owners of the one side have of common right the propriety of the soil usque filum aquae, and the owners of the other side the right of soil or ownership unto the filum aquae on their side.    And if a man be owner of the land on both sides, in common presumption he is the owner of the whole river according to the extent of his land in length."

But it is important to have a correct understanding of the force and meaning of the term "riparian proprietor," for it is obviously competent for a grantor of land owning to the center of a stream to fix the boundary lines and limit the grant as he may choose.    If he wishes and intends to exclude the entire bed of the stream and all of the bank beyond a definite line on the top of it, he may undoubtedly do so by employing apt words to express his intention. "In all cases where the language used clearly shows such to be the intention of the grantor, the bank, side, margin or shore become themselves monuments and are to be treated as such."    *Bradford* v. *Cressey*, 45 Maine, 13 ; *Haight* v. *Hamor*, 83 Maine, 457.    In *Bardwell* v. *Ames*, 22 Pick. page 354, Shaw, C. J., said :    "The owner of the shore or the proprietor of the land bounding on the river generally, is the owner of the soil to the central line of the stream, commonly called the filum aquae or thread of the stream. . . .    Such an owner is conveniently enough designated by the significant appellation of riparian proprietor. . . .    By this designation, I understand an owner of land bounded generally upon a stream of water, and as such having a qualified property in the soil to the thread of the stream with the privileges annexed thereto by law."

3.    At the time of the conveyance from the Franklin Company to the defendants in 1867 of the land in question on the Lewiston side of the river, the Franklin Company had become a riparian proprietor with title to the center of the river on each side and had thus acquired the ownership of the entire bed of the river at that point.    In the deeds by which it acquired its title on the Auburn side, its lands are bounded "by the river" and it appears that they extended up river beyond the defendants' lot.    It also appears from the deeds that its land in Lewiston was "bounded westerly by the

Great Androscoggin river." And a deed which describes a line along a non-tidal river as running "with" or "along" the stream, or as running "by" or "on" the stream or "up" or "down" the stream, carries the title to the center of the stream unless the contrary appears. *Lowell* v. *Robinson*, 16 Maine, 360; *Lincoln* v. *Wilder*, 29 Maine, 179; *Pike* v. *Monroe*, 36 Maine, 309; *Mansur* v. *Blake*, 62 Maine, 38; Farnham on Waters, sects. 852-853.

It has been seen that there was no legal obstacle to prevent the Franklin Company from separating its estate at or near the water's edge so as to convey the upland and retain in itself the title to the bed of the stream. The plaintiffs contend that such was its intention, and that it employed apt language to express that intention in its deed of December 24, 1867 to Bearce and Coe, the defendants' predecessors in title. Attention has already been called to the two leading calls in the description of the grant in that deed which are :—"Westerly by the northerly line of Avon street extended about 491 feet to the outmost line or margin of the bank or shore of the Androscoggin river; thence up said river by said line·or margin to a point," etc. The marked difference between "the outmost line or margin of the bank" as the westerly boundary of the lot and the description found in the original deed to the Franklin Company in which it was bounded "westerly by the Great Androscoggin river" is highly significant. If it had been the intention of the Franklin Company to convey to Bearce and Coe the title to the bed of the river which was acquired by the original deed to the Company, it would have been natural to employ the same language in the description of the lot and to bound it westerly by the Androscoggin river and not by "the outmost line or margin of the bank of the river." This studied departure from the terms of the original deed indicates a manifest intention to fix a different westerly bound for the grant in the deed to Bearce and Coe.

In *Nickerson* v. *Crawford*, 16 Maine, 245, the line of the land conveyed was described as extending "to the margin of the cove, then westerly along the margin of the cove," and the court said : "The general rule is that lands bounded upon rivers or streams of water extend to the thread of the stream unless the description be

such as clearly to show a different intention. . . . . In this case the land conveyed is not by any term used extended to the water, but is bounded by a line without the edge of the water, and the flats are not included." The bank of a river extends to the margin of the stream to that point where the bank comes in contact with the stream; and it is a monument which may be a boundary to a grant. *Morrison* v. *Bank*, 88 Maine, 160; *Proctor* v. *Railroad Co.*, 96 Maine, 473; Farnham on Waters, sect. 857. But a grant bounded by the bank of a stream would extend only to the water's edge and not to the center of the stream.

That it was not the intention of the Franklin Company to extend the grant in question to Bearce and Coe, beyond the water's edge in any event, is manifest from another provision in the deed giving to the grantees the "right to erect and maintain at all times all such booms, piers and other fixtures as they wish or find necessary in front of said land for the successful prosecution of their business upon said premises." Their business on the land conveyed at that time was that of operating a saw mill, and this express authority to erect and maintain booms was entirely superfluous if the grant of land extended to the center of the river. But if the Franklin Company retained their title to the bed of the river the grantees would have no right to erect and maintain booms over the bed of the streams without express provision therefor in the deed.

A very persuasive argument is presented by the plaintiffs' counsel in support of their contention that the "outmost line or margin of the bank" should be interpreted in the light of the evidence to signify the top or brow of the bank, and that the defendants' land does not extend beyond a line thus located.

But in the opinion of the court it is unnecessary to decide whether or not the defendants' grant stops at the brow of the river bank or extends to the water's edge. It is only material to determine in this case whether or not the defendants' land extends beyond the water's edge so as to include the bed of the stream, and the court is clearly of opinion that it does not, the Franklin Company having retained in itself the title to the bed of the river.

4.   The question respecting the ownership of the ice in the river at this point is but a corollary from the foregoing proposition that the bed of the river is owned by those under whom the plaintiffs claim title to the ice.   "The right to take ice . . . . results from and grows out of the title to the bed of the stream. . . . The plaintiff therefore has the sole right to take ice from the water resting upon his land."   *Stevens* v. *Kelley*, 78 Maine, 445.   This is the settled doctrine of this State.   It is recognized in the more recent cases of *Barrett* v. *Ice Co.*, 84 Maine, 156 ; *McFadden* v. *Ice Company*, 86 Maine, 319, and *Wright* v. *Woodcock*, 86 Maine, 113.   See also Farnham on Waters, sect. 140.   It is only the riparian proprietor in the full sense of the term, whose land is bounded by the river generally, and is thus made to include the bed of the stream to the middle thread, who has the right to take the ice in front of his land.   The test of the title to the ice is the ownership of the soil over which it is formed.   The defendants are not riparian proprietors in the full sense of the term.   Their land does not in any event extend beyond the edge of the water.   They do not own the bed of the river over which the ice is formed, and hence have no title to the ice.   The plaintiffs, Wilson and Son, took from the Franklin Company by lease for twelve years from January 1, 1906, and the Lake Auburn Crystal Co., the other party plaintiff, acquired certain rights and interests by virtue of a bond for a deed from Charles C. Wilson, a member of the plaintiff copartnership of Charles C. Wilson & Son.   At the time this bill in equity was commenced the title to the property was in Charles C. Wilson and Charles H. Wilson.

5.   Finally the plaintiffs confidently assert that the acts done and threatened by the defendants immediately prior to the commencement of this bill, were unmistakable evidence of an intention on their part to cut and remove the ice over the bed of the river owned by the plaintiffs, and that they constitute ground for relief in equity under the recognized principles of modern equity jurisdiction.

The Franklin Company and its successors in title, including these plaintiffs, have exercised acts of ownership over the bed of the river opposite the defendants' premises and used the river at that point

as a part of an ice field since 1875, at least, a period of more than thirty years, and there is no evidence that their right or title had ever been disputed until the question was raised by the defendants to this bill in 1908. Nearly opposite the middle of the defendants' premises the river is divided by the Franklin Company Island into two currents, one going westerly near the Auburn shore and the other easterly near the Lewiston shore. The ice field in 1908 extended on both sides of this island, and on the Lewiston side up to a point above the most northerly limit of the defendants' land. The plaintiffs have two ice houses on the river one on the Auburn shore below the island but above the railroad bridge and the other on the Lewiston shore some distance below the bridge; and it appears from the evidence that in filling the Lewiston house the owners have always taken ice from the ice field opposite and above the defendants' premises being the nearest available field, and floated it in the most direct course practicable utilizing the current of the river, to the ice house below; and for this purpose have kept open and used an ice way or channel near the Lewiston shore opposite the defendants' premises. It also appears that in operating these ice fields only a small part can be cut and that considerable areas must be left uncut near the banks of the river and elsewhere from which to carry on the operations and upon which the snow scraped from the ice to be cut can be dumped.

On the premises of the defendants were two buildings called "dry sheds" and in the fall and early winter of 1908 they converted these sheds into ice houses and commenced the construction of an ice slip into the river. They also set a line of stakes running from near the corner of the dry sheds across the channel to the island, for the apparent purpose of marking the limits of the ice field from which the defendants proposed to cut and remove the ice. The storage capacity of these two ice houses was estimated at 1500 tons and the defendants admitted in evidence that they intended to cut a sufficient quantity to fill them from the field in front of their premises. In their answer to the plaintiffs' bill the defendants also expressly admit the allegation of the plaintiffs that they "intend to enter upon the shores of the river adjacent to the premises owned by

them  .   .   .   .   and to cut and harvest and remove from said river the ice crop forming in and upon the same at said points, said slips and other structures being intended to be used by them in cutting, harvesting and removing said ice." November 21, 1908 the plaintiffs gave the defendants notice in writing that they owned all the ice on the river between the northerly and southerly limits of the defendants' land ; but the defendants persisted in their claim of right to cut the ice and continued the erection of the ice slip.

It satisfactorily appears from the evidence that if the defendants had been allowed to cut and remove the ice opposite their premises as they intended, they would not only have taken and converted to their own use 1500 tons of the plaintiffs' ice, but in so doing would have destroyed the plaintiffs' customary margin of ice left for travel, as well as the ice channel and dumping grounds heretofore maintained, and compelled the plaintiffs to resort to more distant fields and radically different methods of operating in order to obtain the 10,000 or 12,000 tons of ice required to fill their Lewiston ice house.

The plaintiffs had learned from long experience that their method of cutting the ice opposite the defendants' premises and of floating it to their Lewiston house, was the most effective and economical one.   For this purpose they had a right to avail themselves of the advantages afforded by their own ice field and to employ their own method of operation and were not compelled to adopt the more expensive and circuitous method suggested by the defendants.   It was shown by the evidence that if the defendants had cut and removed the ice from the field indicated by their stakes, there was a reasonable probability that the increased expense of filling the Lewiston ice house by the method of operating made necessary by the defendants' interference with the plaintiffs' rights, would have been essentially prohibitive.

The basis of all equity jurisdiction in this class of cases is the inadequacy of the remedies at common law.   It manifests itself chiefly in cases of irreparable injury and continuing or repeated trespasses and nuisances involving a multiplicity of actions at law. 5 Pom. Eq., sects. 501-514.

But irreparable injury in the sense in which it is used in conferring jurisdiction on the courts of equity does not mean that the injury complained of is incapable of being measured by a pecuniary standard. Thus an appropriation of the land of another, constituting a permanent injury to and depreciation of the property, is an irreparable injury owing to the uncertainty of the measure of damages. *Wilmarth* v. *Woodcock*, 58 Mich. 482, (25 N. W. 475). Where the extent of a prospective injury is uncertain or doubtful, so that it is impossible to ascertain the measure of just reparation, the injury is irreparable in a legal sense, so that an injunction will be granted to prevent such an injury. *Lyon* v. *McLaughlin*, 32 Vt. 423.

So a continuing nuisance which prevents the comfortable use of one's property and the enjoyment of his property rights creates an irreparable injury, as does one also which may break up a business, destroy its good will and inflict damages which are incapable of measurement, because the elements of reasonable certainty for their computation are wanting. 5 Pom. Eq., sect. 574; *Edwards* v. *Mining Co.*, 38 Mich. 46.

In *Props. Me. Wharf* v. *Props. Custom House Wharf*, 85 Maine, 176, a bill for an injunction against maintaining a narrow strip of wharf in front of another proprietor's wharf, the court said: "Equity will restrain the continuance of a nuisance by injunction whenever substantial damages might be recovered at law, or where the nuisance is permanent, however small the damages."

In *O'Brien* v. *Murphy*, 189 Mass. 357, the court said: "The inconvenience and annoyance from repeated trespasses, though relatively harmless, but which interfere with the free use and enjoyment of real property, justify the interference of a court of equity to prevent their continual repetition, even if a recovery of nominal damages at law would afford full compensation. . . . . . "If the plaintiff's title is put in issue, it can be determined as well by a court clothed with full equity powers as at law. The jurisdiction at least is concurrent." See also *Fernald* v. *Knox Woolen Co.*, 82 Maine, 55, and *Lockwood Co.* v. *Lawrence*, 77 Maine, 297. If the defendant has threatened to do acts of the kind which equity

enjoins, that will also be sufficient ground for injunction. And threats may be purely verbal without any acts, or they may consist of acts from which the inference as to the defendants' intention may be drawn. 5 Pom. Eq., sect. 501.

The taking of the plaintiffs' ice in the winter of 1908-9, and the construction of the ice slip as threatened by the defendants, would have involved a continuing trespass during that and each succeeding season, and the interference of the plaintiffs' established methods of business by the same acts would have been a continuing nuisance to the plaintiffs in depriving them of the enjoyment of their property rights.

For the injury to the plaintiffs occasioned by such a continuing nuisance in the complex situation disclosed by the evidence, the damages in an action at law would have been incapable of measurement by any accurate standard owing to the fact that the elements of reasonable certainty would have been wanting. The remedy at law would not have been as practical and efficient as in equity but would have been incomplete and inadequate.

It is accordingly the opinion of the court that the plaintiffs' bill must be sustained, with one bill of costs and the temporary injunction be made permanent.

*Decree accordingly.*