**Stephen E. HEDBERG et al.**

v.

**Otto H. WALLINGFORD et al.**

Supreme Judicial Court of Maine.

Oct. 28, 1977.

Platz & Thompson, P. A. by Philip K. Hargesheimer, Lewiston, for plaintiffs.

Trafton, Scales & Smith by Willis A. Trafton, Jr., Auburn, for defendants.

Before DUFRESNE, C. J., and WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

GODFREY, Justice.

This case involves the disputed title to land lying west of Lapham Brook in the city of Auburn. The property in question is part of a larger parcel, once owned by Agnes S. Irish, known as "the Irish land." The plaintiffs, claiming as the heirs of Agnes S. Irish, brought a complaint in Superior Court against the defendants, seeking money damages as well as title and possession of the disputed property. The defendants answered the complaint by claiming title to the property under a 1965 deed from Nancy L. Whatley, granddaughter of Agnes Irish, to Otto H. Wallingford. The sole issue generated by the pleadings was whether the Whatley-Wallingford deed conveyed, as the defendants claimed, all the former Irish land west of Lapham Brook or only a portion of that land.

The defendants moved for summary judgment pursuant to Rule 56 of the Maine Rules of Civil Procedure, and with the agreement of both parties the Superior Court appointed a referee to hear the motion and make a report of his conclusions of law, reserving to the parties the right to object. In thus referring the case with the parties' agreement, the court purported to act pursuant to M.R.Civ.P., Rule 53. Construing the Whatley-Wallingford deed, the referee concluded that it effectively conveyed all Irish land west of Lapham Brook and that the defendants' motion for summary judgment should be granted. Adopting the referee's report and basing its decision thereon, the Superior Court granted the motion for summary judgment.

Having seasonably but unsuccessfully objected to the allowance of the report, plaintiffs now appeal from the judgment, asserting that the referee had made findings of fact not permitted on a motion for summary judgment. Specifically they assert that the referee and the Superior Court, by its total adoption of the referee's report, erred in making a finding as to what the intention of the parties had been at the time the Whatley-Wallingford deed was executed.

The agreement and order of reference limited the referee's inquiry to reporting his conclusions of law, to be reached on the basis of the pleadings, interrogatories, affidavits with annexed documents filed by defendants (including the Whatley-Wallingford deed), recorded instruments and affidavits offered by the plaintiffs, and other matters stipulated to by the parties.

### Propriety of Reference on a Motion for Summary Judgment

Because a motion for summary judgment must be decided on the pleadings, supporting documents, and stipulations of the parties without resort to independent findings of fact, the threshold question presents itself whether a controversy such as this one, requiring determination only of issues of law, may be referred under M.R. Civ.P., Rule 53. Subsection (b)(1) of that rule provides that the court may appoint a referee "in all cases where the parties agree the case may be so tried." On its face that language could be deemed to imply that referees must "try cases" in the sense that they must be in a position to make findings of fact as well as draw conclusions of law. However, section (c) of Rule 53 provides that the court's order of reference may "specify or limit" the referee's powers and may direct the referee to report only upon particular issues. This power of the court to frame and limit orders of reference seems capable of being read broadly enough to authorize limiting a referee's inquiry solely to an issue or issues of law.

Normally the procedure of reference is used to relieve the trial court of a complex

and time-consuming inquiry into facts. Sometimes, also, a referee has expertise that makes it easier for him than for a judge with general jurisdiction to organize and interpret technical data. However, a trial court is ordinarily as well equipped as any referee in resolving questions of law, and thus, in most cases, questions of law should not be referred because none of the purposes of efficiency and convenience contemplated by Rule 53 would be served. Nevertheless, we are not prepared to hold that a controversy requiring solely conclusions of law for its resolution, raised by a motion for summary judgment, may never be referred under section (b)(1) of Rule 53.

The first inquiry on a motion for summary judgment is whether, as a matter of law, any material facts are in issue. In the present case, in deciding to adopt the referee's report, the trial court expressly observed:

".  .  . the facts of this case are exceedingly complex. Consequently, it was necessary for the referee to devote a considerable amount of time to consideration and distillation of these facts before he was able to conclude that 'no material or controlling facts are in dispute.'"

We consider that the documents involved in this case were sufficiently technical, complex and difficult to understand to justify the presiding justice, with the consent of the parties, in referring the motion for summary judgment to a referee with expertise in the field of conveyancing. Though such a motion should be referred only in exceptional circumstances, we find no abuse of discretion in this particular reference.

### Correctness of Referee's Conclusions

By virtue of stipulations, the problem before the referee was reduced to determining whether the 1965 Whatley-Wallingford deed conveyed all the so-called Irish land in that locality west of a certain agreed-on line segment or only a roughly rectangular parcel of about 3.5 acres having the agreed-on line segment as its easterly boundary and 200 feet wide at the southerly end and 140 feet wide at the northerly end. If the deed conveyed only the roughly rectangular parcel, appellant would have title to the land here in question, a parcel four to eight acres in area.

There was and could be no disagreement that the deed contained serious error and inconsistencies. All parties agreed on the location of the point of beginning. The first call from that point was for a line running "southwesterly by line of said Jackson land" about 200 feet "to a corner in said line." All parties agreed the call should have been for a line running northwesterly instead of southwesterly because otherwise the entire description makes no sense when applied to the ground. However, the first corner in the line of Jackson land, when the line is run northwesterly, is 518.5 feet, not 200 feet, from the point of beginning.

The next call was "northwesterly by line of said Jackson land about 900 feet to line of land of Camille Gardner." The surveyor's affidavit states that the northeasterly boundary of the Jackson property ends at or near the corner in the first boundary call, with the result that there is in fact no "line of Jackson land" for the second boundary call to follow. The surveyor testified also, however, that Mrs. Irish's land in this area had been assembled from two adjoining triangular parcels. The northwesterly boundary of the southerly of these two parcels ("the Sawyer lot") began at the very corner of the Jackson line referred to above and ran about 334 feet northeasterly to a corner, where it met the southwesterly boundary of the northerly of the two former triangular parcels ("the Caswell lot"). At that point, according to the surveyor, the boundary of the former Irish land turned northwest and ran about 742 feet to a corner on the southerly edge of property formerly owned by one Verrill and now owned by Lost Valley, Inc., the grantee of all Mr. Wallingford's land in this vicinity. Thus the survey showed the westerly boundary of the Irish land here in question as a broken line, the southerly segment beginning at the corner of the line of Jackson land referred to above and forming a reen-

trant angle with the northerly segment, which terminated at its northerly end at the northwest corner of the former Caswell lot. That northern terminus of the westerly boundary of the Irish land does not fall on the boundary of any land ever owned by Camille A. Gardner, but that terminus would be on the Gardner line if the Gardner line were extended in a westerly direction. The surveyor's deposition, with accompanying map, showing the location of the Irish parcel and the boundaries of abutting tracts was uncontradicted.

The third boundary call in the Whatley-Wallingford description is "thence northeasterly by line of land of said Gardner across Lapham Brook to a corner of said Gardner's land a distance of about one hundred forty (140) feet." All parties agree that the easterly terminus of this third boundary is correctly located on the survey map. If the line is only 140 feet long, it lies entirely along the Gardner boundary. If the point of beginning of this boundary is the northwest corner of the former Caswell lot, the boundary is 627 feet long and is adjoined by Gardner property only for part of its distance, the westerly segment lying along an extension of the Gardner line.

The last call is "thence in a southeasterly direction to the point of beginning a distance of about nine hundred (900) feet." The parties agree on the location of this line even though the line runs for 1,385 feet southwesterly, not 900 feet southeasterly.

Other facts made available to the referee as having possible relevance to the controversy were as follows:

(1) Defendant Wallingford made an affidavit stating that he and another man were assembling land in the early 1960's for development of a ski resort, "Lost Valley". In 1964, in order to make changes in the access road to Lost Valley and obtain additional parking space, he had communicated to Dr. Hedberg his interest in buying from the Irish heirs a parcel of land that would eliminate the jog in the line where Irish land jutted west of Lapham Brook. Dr. Hedberg arranged for a conveyance from Whatley to Wallingford for the price of $500. Wallingford's affidavit falls short of asserting that the transaction was based on an understanding on both sides that all the Irish land west of the brook would pass by the deed. Plaintiffs argue that to make changes in the access road and provide parking space it would have sufficed to purchase the roughly rectangular area described by the footage calls in the deed. The defendants argue that it would have made no sense for the deed to leave unconveyed an irregularly shaped gore almost cut off from the rest of the Hedberg lands and virtually isolated amid the surrounding lands being acquired by Wallingford and his associate for the Lost Valley project.

(2) The small-scale city property tax map of 1962 showed the Irish property west of the brook in this locality to be a roughly rectangular piece of land lying along the brook. It did not show the irregular westerly border, with the reentrant angle, that resulted from the earlier assembling of Irish land from the Sawyer and Caswell lots.

(3) The Whatley-Wallingford deed nowhere explicitly stated the purpose of transferring all the Irish land west of the brook. Defendant Wallingford explained the absence of such a statement on the ground that Mrs. Irish had owned some other land, not here in controversy, also west of the brook which it had not been the purpose of the parties to transfer.

(4) Nothing in the record indicates that the $500 price for the transfer was based on acreage. In fact, the 1965 Whatley-Wallingford deed replaced a 1964 deed between the same parties, in which the distances called for had been much shorter, and the Hedbergs had exacted no payment for the corrective replacement. Both the 1964 and 1965 deeds had been drawn up by estimating the dimensions of the parcel to be conveyed by measuring the distances on the inaccurate city property tax map. Nothing in the record before the referee indicated the value per acre of the Irish land in 1964 or 1965.

(5) The 1965 Whatley-Wallingford deed and its 1964 predecessor had been drawn by

an attorney retained for the purpose by the grantee.

(6) Defendant Lost Valley, Inc., transferee from defendant Wallingford, placed improvements on the land in controversy. In 1968 it built a caretaker's house lying entirely within the disputed parcel, and in 1970 it completed a maintenance building lying halfway across the northerly boundary of the disputed parcel.

The referee decided that on the record no material or controlling facts were in dispute and the case was in proper posture for disposition by summary judgment. In effect, he held that the "corner in the line" of Jackson land, which is the westerly terminus of the first boundary call in the description, must be treated as a monument that defines the length of the first, or southerly, boundary of the parcel conveyed by the 1965 Whatley deed. There was indeed a corner in the line of Jackson land according to the survey, and if the rest of the described boundary can be applied to the ground on the basis of treating that corner as a monument, the referee was correct in holding that it prevails over the approximate distance call of "about two hundred (200) feet," especially in view of conceded gross inaccuracies in certain other distance calls in the deed. *Rodrigue v. Morin,* 377 A.2d 476 (Me.1977).

■■■ The crucial question is whether the referee was correct in concluding as a matter of law that the second boundary call, "northwesterly by line of said Jackson land about 900 feet to line of land of Camille Gardner," established the irregular westerly border of the Irish land as the westerly boundary of the demised parcel. There was in fact no Jackson land north or west of the corner designated as the starting point of this boundary.

Had no boundary whatever of anyone's land extended from that corner to serve as a westerly bound of the conveyed land, the corner would fail as a monument to mark the southern terminus of such a westerly bound. However, the surveyor's deposition and map made it clear that the southerly segment of the westerly boundary of the Irish land passed through that corner. Though the land to the west of the Irish land was not "Jackson land," the referee held that this well-defined boundary must be construed to refer to the boundary of the westerly abutter, whoever that might be, and that consequently the boundary was a monument as a matter of law. He extended his reasoning to include the northerly segment of the westerly boundary of the Irish parcel even though that segment formed a reentrant angle with the southerly segment.

The referee encountered three problems in reaching his conclusion that the westerly boundary of the Irish land was the westerly line of the parcel conveyed. First, the southerly segment of the bound proceeded slightly northeast, not northwest, from the corner on the Jackson line. On this matter, the referee observed that the northerly segment of the Irish boundary turned northwesterly so that the point where the second bound in the description met the line (as extended) of Camille Gardner's land was in fact north and slightly west of the Jackson line corner, as was called for in the description. The mere fact that the line of abutter's land was a broken line does not impair the establishment of that line as a monument.

Second, the northerly segment of the westerly bound of the Irish land did not have its terminus on the actual boundary of Camille Gardner's land. However, it met the southerly line of another northern abutter at a point that would lie on the Gardner line if that line were extended in a westerly direction. The language "to line of land of Camille Gardner" certainly is capable of bearing the construction the referee gave it.

Third, the conclusion that the westerly boundary of the Irish land is the westerly bound of the demised parcel makes the northern bound of the demised parcel 627 feet long (since the location of the last, or easterly, bound was agreed on by the parties), whereas the deed calls for a distance of "about 140 feet." Again the referee took the position that the monuments for the third, or northerly, boundary of the

demised parcel, which he found satisfactorily established, must prevail over the approximate distance call.

■ On the facts before him in this case, it would have been improper for the referee not to apply normal rules of construction on some ground that additional parol evidence might show the actual intention of the parties contrary to that manifested by the language of the deed itself. This action was not one for reformation. Given the pleadings, stipulations, affidavits and related documents, there was no question of how the boundary should be applied to the ground, only the question of what the boundary was under the terms of the deed—a question of law. *Rusha v. Little,* 309 A.2d 867, 869 (Me.1973). At no point did the referee's conclusion depend on any inference of actual intent from parol evidence.

We agree with the referee's application of the rule in this case. He construed the deed to determine what the boundaries were by application of so-called rules of intent assigning priorities as among inconsistent calls. He had before him all the facts necessary to draw such conclusions. Though some language in his report sounded as if he were reaching his conclusions by inferring intention of the parties as a matter of fact, the referee was actually construing the deed. The result does not depend upon any finding by the referee that the parties to the deed actually understood that all the Irish land west of the brook was to pass. He did think that the description of the second bound in the parcel, by running along the line of a westerly abutter, showed a purpose not to retain any of the Irish land in the grantor. Otherwise, the second bound would have had to be described in some way to indicate that the abutting property on the west was other land of the grantor. By so stating he was merely articulating one reason behind the rule that monuments control over distances.

We hold, therefore, that the referee reached his conclusion as to what the boundaries were by construction of the deed itself. His conclusions were conclusions of law within the scope of the order of reference, and they were correct.

The entry is:

Appeal denied.

Judgment affirmed.

POMEROY, J., did not sit.

All Justices concurring.